IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ANGELA TONYAN,

                                                    OPINION AND ORDER

            Plaintiff,

                                                    18-cv-402-bbc

      v.

DUNHAM'S ATHLEISURE CORPORATION,

           Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

      Plaintiff Angela Tonyan brought this suit under the Americans with Disabilities Act
(ADA),  42 U.S.C. § 12112, against her former employer, defendant Dunham's Athleisure
Corporation.  She contends that defendant failed to accommodate her shoulder disability
and terminated her from her job as a store manager because of her disability.  Defendant has
filed a motion for summary judgment, contending that plaintiff's ADA claims fail because
she cannot show that she could perform the essential functions of her job with or without
reasonable accommodation.  Dkt. #16.  I agree with defendant that plaintiff has failed to
present evidence from which a reasonable jury could conclude that she could perform the
essential functions of her job.  Therefore, I am granting defendant's motion for summary
judgment.

      From the parties' proposed findings of facts and responses, I find the following facts
to be material and undisputed unless otherwise noted.

UNDISPUTED FACTS

### A. The Parties

Plaintiff Angela Tonyan worked for defendant Dunham's Athleisure, a discount sporting goods retailer, from 2007 until her termination in December 2015. Plaintiff was hired by defendant as an assistant store manager at its Rice Lake, Wisconsin store in November 2007. On September 25, 2009, plaintiff injured her left arm while working. She had left rotator cuff surgery in April 2010. After September 25, 2009, plaintiff had temporary restrictions on her left arm, which defendant accommodated. In September 2011, while still on temporary restrictions for her left shoulder, plaintiff was promoted to store manager in Menomonie, Wisconsin. In January 2012, plaintiff was given permanent restrictions on her left shoulder, which included the following: lifting limit of 15 pounds overhead and 60 pounds to waist; occasional reaching above shoulder; and restrict right and left hand and wrist torqueing.

### B. Defendant's Business Model

As a discount retailer, defendant seeks to keep labor costs low, maximize available store space and make as much product available on the sales floor as possible. Each store is assigned a budget for both hourly and salaried employees based on the store's sales volume. Defendant attempts to provide stores enough staff hours so that customers are assisted and inventory is unloaded, handled and displayed in a timely manner. Defendant does not pay overtime wages to hourly staff. Defendant's staffing model requires its salaried store

2

management, including managers and assistant managers, to engage in physical labor throughout their workday. This includes tasks such as receiving shipments, unloading trucks, storing and putting away inventory, moving inventory to the sales floor, stocking and merchandising inventory, assisting customers, training associates, moving inventory from displays and moving heavy items to customer vehicles. In most stores, at least some merchandise is stored high on shelves and hung from the ceilings.

## C. Menomonie Store

The Menomonie store at which plaintiff worked was 23,200 square feet, including an approximately 1,600 square foot stock room. Products are displayed at all levels. Approximately half of the inventory is displayed between five feet to 12 feet high. Bikes are stored overhead on bike racks and canoes and kayaks are stored overhead. Boxed merchandise is stored on all levels in the stockroom. Throughout the day, product is moved from the stockroom to the retail floor.

The Menomonie store has various tools available for employees to retrieve products that are stored above shoulder level. Employees use telescoping hooks that extend approximately 14 feet high to hang or remove merchandise. To retrieve heavier apparel, such as heavy jackets or sweatshirts, employees must use both hands to lift and balance an extended pole. The store has ladders in various sizes, some of which require reaching outwards and lifting above shoulder level to open, move or close them. Other tools include pallet jacks, stools and four-way wheeled carts.

D.  <u>Store Manager Position</u>

When plaintiff was promoted to store manager of the Menomonie store, she signed a job description that set forth "responsibilities" and "essential functions" of store management positions.  The job description was developed by defendant's human resources team and was based on an existing job description from 2008, personal experience of the human resources team, outside sources, store observation, store manager interviews and a review by the operations team.  (Plaintiff argues that it is not clear which job description applied to her, but her argument is not persuasive.  The various job descriptions submitted by the parties are nearly identical and do not differ in any way that is material to this case.)

The job description identifies several areas of "responsibilities," including customer service, sales volume, scheduling, merchandising, human resource functions, training, general maintenance, shipping and receiving.  These areas of responsibility encompass tasks such as recruiting and training new associates, reviewing store employees, scheduling, completing reports, assigning daily work to staff, balancing and reconciling receipts, entering financial data and making bank deposits.

The "essential  functions" section of the written job description states, among other things:

Constantly: Stand, Walk, Reach Outward, Handling/Fingering.

Frequently: Reach Above Shoulders, Squat or Kneel, Lift/Carry up to 40 lbs., Push/Pull up to 40 lbs.

Occasionally: Sit, Climb, Crawl, Lift/Carry 41 to 100 lbs. with assistance.

Not Applicable: Lift/Carry over 100 lbs. without assistance.

Dkt. #19-1. Defendant considered "constant" to mean activities performed regularly and on a daily basis; "frequent" to be activities performed more than 50 percent of the time; and "occasionally" to be activities engaged in up to 50 percent of the time. The written job description did not spell out how the managers were to insure that all of the necessary tasks were accomplished, as store management was expected to delegate some tasks to associates.

The job description was intended to convey the point that physical activities are an essential function of store management positions. Defendant expects store management to engage in physical activities so that defendant can assign fewer persons to a store. If a manager is unable to perform some of the physical tasks on a regular basis, other members of the management team must either perform additional work or defendant must allocate additional labor hours to the store so that sales associates can handle physical tasks. Assigning additional labor hours can undermine defendant's cost efficient staffing model.

In some geographic areas, including Menomonie, there is a labor shortage. The Menomonie store relies on students as a source of hourly labor. Students and other part-time associates typically have limited availability and cannot always take on extra work hours. Thus, even if defendant approves additional labor hours, the store may not be able to find employees who can fill the hours. If a store is understaffed and sales associates have to take on physical jobs, sales associates may be less responsive to customer needs and customer satisfaction can suffer.

The parties dispute how "physical" the store manager position is. Defendant says that

store managers across all of its stores spend more than 50 percent of their time performing "physical" tasks. Plaintiff says that in her experience, she spent approximately 10 percent of her day engaged in physical activities. It is undisputed that before plaintiff became manager of the Menomonie store in September 2011, Jane Campbell and Lucas Henning were the managers of the store. Both Campbell and Henning regularly performed physical tasks that required them to lift items above their heads or reach above shoulder level, including unloading trucks, storing inventory, moving inventory to the floor, resetting areas of the store, installing grids and assisting customers while frequently lifting items above their heads or while reaching.

During plaintiff's tenure as store manager in Menomonie, Reed Lein was the assistant store manager and Elizabeth Sand was the department manager for apparel. After plaintiff's employment was terminated, Lein became store manager and Sand became assistant store manager. Both remain in these positions today.

As manager of the Menomonie store, Lein spends 60 to 70 percent of his time as store manager performing physical tasks. Lein spends at least half of his time on merchandising, which includes the following physical tasks: putting merchandise on shelves and hooks; moving shelves around; taking shelves out of aisles and replacing them with bars; putting kayaks up on bars; moving kayaks; building grids; putting merchandise on grids; and organizing boxes. Lein is more than six feet tall, and states that more than half of the merchandise in the store is above his shoulder level. His position requires him to reach outward about 80 percent of the time. Sand also performs physical tasks to assist customers

in her position as assistant manager, including taking kayaks or treadmills to a customer's car, particularly when the store is short-staffed and associates are busy assisting other customers.

E. <u>Plaintiff's Experience as Store Manager</u>

Plaintiff received positive performance reviews during her time as store manager. Plaintiff spent the majority of her time as store manager performing supervisory work and focusing on customer service and sales. In light of her left arm restrictions, she moved items that she needed in her office to waste level and moved the manager's computer terminal to the sales floor, so that she was accessible to customers. She delegated physical work to her staff, and never experienced or heard about an employee's reacting unfavorably or complaining about the tasks she delegated. Plaintiff did not lift items overhead while she worked as store manager, because she used levered dollies, stools, ladders or other employees to retrieve high items. She relied on two-person teams to carry heavy items to the sales floor. She frequently delegated the unloading of freight from a truck to her assistant manager, Reed Lein, who did not mind physical work. If Lein was not working, plaintiff unloaded freight using a pallet jack, so lifting was minimal. However, because the jack has to be moved manually, using a pallet jack sometimes requires another employee pushing from the other side of the box while the jack operator pulls or pushes with significant force. Additionally, unloading freight can require taking down boxes that are 6 to 8 feet tall, carrying items and unpacking the boxes.

In September 2013, plaintiff hurt her right shoulder at work while attempting to hang five heavy jackets at one time using a telescoping pole. By April 2014, plaintiff could no longer raise her right arm. Plaintiff's doctor provided her the following temporary work restrictions for her right shoulder: lifting limit of 15 pounds overhead; no reaching above right shoulder; no repetitive right and left wrist motions; no operating vibrating tools with right hand; and no torqueing with right hand. Despite the temporary restrictions, plaintiff's right shoulder problems continued to worsen. Hanging any objects overhead increased her soreness. Until June 2014, plaintiff engaged in physical therapy for her right shoulder, continued to see her doctor and worked with temporary restrictions.

On June 30, 2014, plaintiff had surgery on her right shoulder. She was on leave under the Family and Medical Leave Act until September 1, 2014, when she returned to work on "light duty." Plaintiff's doctor restricted plaintiff as follows: limited to working four hours a day; lifting limit of one pound with right arm; no reaching above shoulder with right arm; no reaching forward with right arm; and no pinching, repetitive grasping, repetitive wrist motion, pushing, pulling, operating vibrating tools, torqueing or keyboard use with right hand and wrist. On October 9, 2014, plaintiff's doctor imposed the following similar temporary restrictions: limit work to four to six hours per day, five days per week; no overtime allowed; no lifting; no reaching above shoulder with right arm; no pinching, repetitive grasping, repetitive wrist motions, pushing or pulling with hands, operating vibrating tools and torqueing with right hand and wrist; and very little keyboard use with right hand. Defendant approved these temporary restrictions imposed by plaintiff's

doctor and allowed plaintiff to continue working with the restrictions.  Plaintiff found that returning to work on a reduced hour basis with restrictions was helpful to her recovery and ability to ease into the physical requirements of her job.

On October 25, 2014, plaintiff aggravated her right shoulder at work while pushing a computer terminal away from the wall.  On January 5, 2015, plaintiff told her doctor that the pain in her left shoulder was worsening, because she had been using it to compensate for the pain in her right shoulder.  Her doctor recommended that she reduce her activity to avoid reinjuring her left shoulder.

On January 15, plaintiff had a second surgery on her right shoulder and went on medical leave.  (Her leave under the Family and Medical Leave Act expired in February 2015, but defendant allowed her to remain on medical leave.)  On March 16, 2015, plaintiff requested permission from defendant to return to work.  She submitted a report from her doctor stating that it was necessary for her to have her right arm in a sling, that she could work four to six hours a day, lift one to five pounds occasionally, rarely reach above her shoulder and occasionally reach forward.  Janet Rieckhoff, the vice president of human resources, denied plaintiff's request to return to work, stating that plaintiff could not return to work with her arm in a sling and that she should take more time to heal.  Plaintiff told Rieckhoff that she had worked in the Rice Lake store with a sling, but Rieckhoff responded that plaintiff could not return as store manager with a sling. (Plaintiff says that Rieckhoff told plaintiff, "We're not going to accommodate" you.

Defendant responds that Rieckhoff told plaintiff her restrictions were too severe and that she needed to heal before she returned.)

On April 15, 2015, plaintiff's doctor submitted a follow-up report to defendant, stating that plaintiff could not use her right arm at all and that she had to be off work for at least another month. In May 2015, plaintiff's doctor revised her restrictions, stating that she could work four hours a day with right arm restrictions. In particular, plaintiff was limited to lifting one pound; no reaching above her shoulder; rare reaching forward; and no repetitive grasping, repetitive wrist motion, pushing or pulling with hands, operating vibrating tools and torqueing with right hand or wrist. On June 16, 2015, plaintiff's doctor modified the restrictions slightly, changing the limitation of no reaching above shoulder with right arm to "rare" reaching, and removing the restriction on reaching forward. Defendant reviewed these restrictions, concluded that they were too severe to be accommodated in the store and directed plaintiff to take additional leave. Plaintiff contacted Rieckhoff about coming back, telling Rieckhoff that she could use her left arm, that she could still perform many of her duties and that returning to work for four hours a day would allow her to ease back into the job, while allowing her to strengthen her right arm. Rieckhoff denied the request, stating, "You can't even lift a ream of paper! Why would I let you come back?"

In August 2015, plaintiff asked her doctor to revise her restrictions. On August 11, plaintiff's doctor provided a report to defendants stating that plaintiff could work

with the following temporary restrictions: lifting 15 pounds overhead with both hands and occasionally reaching above shoulder with right arm. The report did not include an hour restriction. On August 31, 2015, defendant permitted plaintiff to return to work with the updated restrictions. Defendant asked plaintiff to sign a statement saying that she would abide by her restrictions.

When plaintiff returned to work on August 31, she had been off work for almost eight months. During the time plaintiff was gone, Lein, the assistance manager, had been performing plaintiff's duties. After plaintiff returned, plaintiff worked approximately 50 hours a week. Lein continued to perform many of plaintiff's physical job duties, including lifting and unloading pallets or large items, retrieving guns, retrieving apparel racks and tables, building display grids, retrieving overhead merchandise and opening doors. When plaintiff attempted to perform physical tasks, she frequently made audible noises, such as "ouch, ouch, ouch" and stated that her shoulder hurt. If plaintiff needed a ladder, other employees would retrieve one for her. Plaintiff told other employees that she was unable to raise her hand or reach out with her hand.

Taking into consideration plaintiff's temporary restrictions and having personally observed her struggle with physical tasks, Jeramy Gilson, defendant's district manager, asked that additional hours be allocated to the Menomonie store. Defendant allocated additional hours to the store.

At the time she returned to work, plaintiff was engaged in physical therapy to strengthen her right shoulder. On September 2, 2015, plaintiff told her physical therapist that her shoulder pain was severe after working. Plaintiff reported that getting shoeboxes down from high shelves was difficult and caused soreness and muscle fatigue.

On September 4, Neil Carter, defendant's worker's compensation administrator, emailed plaaftintiff to ask how her return to work was going. Plaintiff responded to Carter that she was "totally exhausted," that she had not been "doing anything for 7 months," but that now she was working "10 hours a day on [her] feet constantly going back and forth in the store." She stated that she was "unable to move the metal security doors at all" and could not push a four-way rack. Plaintiff took the next day off to recover.

On September 9, plaintiff told her physical therapist that she was still having difficulty lifting a shoebox and was unable to push or pull the doors open at work. Plaintiff's physical therapist advised her to call her doctor to get hour restrictions at work because of fatigue.

On September 11, worker's compensation administrator Carter asked district manager Gilson how plaintiff's return to work was going. Gilson responded, "She has been doing fine as far as work performance is concerned. I have a feeling that she is trying to do too much in too short of a time. She needs to give herself breaks sitting down during the day . . . . I highly doubt that she will step down as she needs the

income. I really think she is looking to work less hours/week." Carter responded to Gilson, "I would very much agree. Her doctor has enabled her to work all the hours required of a store manager."

On September 13, plaintiff was pushing a four-way rack with shirts on it, when the rack hit a zip tie on the ground and stopped suddenly. Plaintiff lurched into the cart, jarring her right shoulder and bruising her arms. On September 16, plaintiff reported the four-way incident and her shoulder pain to her physical therapist and stated that she was working 55 hours a week. Her physical therapist recommended that plaintiff contact her doctor for a reduction in work hours. Plaintiff contacted her doctor, who issued a new restriction limiting her hours to 40 hours a week, with two days off in a row, with 15 pounds overhead lifting on both sides and only occasional reaching above the shoulder on the right side. Defendant permitted plaintiff to reduce her hours. (Plaintiff states that she was not allowed to return to work after September 16, but the evidence does not support this. Plaintiff told her physical therapist that she worked until at least September 24. Dkt. #22-1 at 29-30. Plaintiff testified at her deposition that her last day of work was September 26, and she identified September 26 as her last day of work in her workers' compensation hearing application. Dkt. #21 at 64.)

On September 24, 2015, plaintiff told her physical therapist that she was having difficulty pulling stuffing out of shoes and taking plastic off clothing. The physical therapist noted that plaintiff was unable to lift even one pound overhead without pain

and recommended that the doctor change the work restrictions to no overhead lifting. That same day, plaintiff's doctor provided an additional temporary work restriction of no reaching above shoulder level. Plaintiff called Rieckhoff to discuss the restriction. After the call, Rieckhoff concluded that plaintiff could not work until she was able to reach above her shoulder level. Defendant approved additional medical leave for plaintiff. (According to defendant, plaintiff told Rieckhoff that she could not do her job without being able to reach so she needed additional time off. According to plaintiff, she told Rieckhoff that she could work, but Rieckhoff refused to let her return to work.)

Plaintiff continued physical therapy in an attempt to strengthen and condition her right shoulder. On September 30, 2015, plaintiff told her physical therapist that since being off work, her shoulder had "calmed down," but that she still had difficulty steering her car. On October 21, plaintiff told her physical therapist that she had difficulty keeping her arm over her head to wash her hair, she could not hold a blow dryer up to dry her hair for more than two minutes and she had difficulty sweeping, vacuuming and carrying a bag.

On October 30, plaintiff's doctor submitted a report to defendant stating that plaintiff was now able to work with the following restrictions: limited to six hours a day, five days a week, with no overtime allowed; lifting limit of two pounds overhead with the right arm; and rare reaching above shoulder with right arm. Defendant did not let plaintiff return to work, but stated that she could take additional time to recover.

On November 4, 2015, plaintiff told her physical therapist that she had difficulty with movements with added resistance away from her body, including pouring coffee, lifting a gallon of milk and putting away heavier dishes into overhead cabinets. On December 2, plaintiff told her physical therapist that she still could not pour a full gallon of milk or pot of coffee and that she was unable to lift anything overhead with any resistance.

On December 21, 2015, plaintiff's doctor submitted a report to defendant that imposed the following permanent restrictions: lifting limit of two pounds overhead with right arm; rare reaching above shoulder with right arm; occasional reaching forward with right arm; no repetitive grasping or wrist motion with right hand and wrist with an outstretched right arm; and no torqueing with right hand and wrist. After receiving her permanent work restrictions, no one from defendant communicated with plaintiff, her doctor or Gilson about what could be done to allow plaintiff to continue her job. However, Daniel Cieslak, the executive vice president of human resources, and Rieckhoff concluded that plaintiff could not return to work because her restrictions were now permanent and her previous attempts to return to work with restrictions had not succeeded: either plaintiff had reinjured herself or she had experienced too much pain to perform her duties. Cieslak and Rieckhoff thought that permitting plaintiff to return to work would require them to hire another person to help plaintiff perform the duties of store manager. Rieckhoff sent a termination letter to plaintiff, saying that "if you have

additional information you feel we should consider please feel free to forward it to us in writing so it can be reviewed." Dkt. #25-1.

## F.  Medical Examinations

In conjunction with plaintiff's workers compensation claim, defendant's insurance carrier ordered an independent medical examination of plaintiff which was conducted on October 27, 2015.  The independent medical examination report by Dr. Thomas O'Brien concluded that plaintiff's right shoulder condition was not the result of working for defendant and her work activities did not materially contribute to her shoulder condition or cause any type of "injury" to the right shoulder rotator cuff mechanism. O'Brien also gave the opinion that plaintiff "does not require any activity restrictions" and that plaintiff "needs to use the shoulder more rather than less."  Finally, he concluded that plaintiff's "requirements as a full-time store manager do not place the shoulder in a position, nor do they require right shoulder activities that would cause an injury to the rotator cuff."  Riekhoff reviewed the report at some point, but could not remember whether it was before or after she terminated plaintiff.  The report was sent to Neil Carter on November 5, and plaintiff's workers' compensation benefits were discontinued shortly thereafter. (There is no evidence that Rieckhoff or Cieslak considered plaintiff's workers' compensation claim when deciding to terminate plaintiff.)

In February 2018, Dr. Joseph Hebl, a medical expert retained by plaintiff,

examined plaintiff.  He also reviewed plaintiff's medical records and the examination conducted in conjunction with plaintiff's workers' compensation claim.  Dr. Hebl concluded from defendant's written job description and plaintiff's description of how the job was actually performed, that plaintiff could have performed the store manager position in 2015 despite her permanent restrictions.

OPINION

Plaintiff contends that defendant failed to accommodate her disability and terminated her employment because of a disability in violation of the Americans with Disabilities Act, 42 U.S.C. § 12112(a)–(b), which makes it unlawful for an employer to "discriminate against a qualified individual on the basis of disability."  There are two types of discrimination claims that may be brought under the ADA:  (1)  a disparate treatment claim, in which the plaintiff alleges the employer treated her differently because of the plaintiff's disability, and (2) a failure to accommodate claim, in which the plaintiff alleges that the employer refused to provide a reasonable accommodation.  Curtis v. Costco Wholesale Corp., 807 F.3d 215, 224 (7th Cir. 2015).  Plaintiff has alleged both types of claims.

To succeed on her disparate treatment claim, plaintiff must show that she (1) is disabled; (2) is a qualified individual, meaning she is able to perform the essential functions of the job either with or without reasonable accommodation; and (3) suffered an adverse employment action because of her disability.  Majors v. General Electric Co., 714 F.3d 527,

533 (7th Cir. 2013). To succeed on her failure-to-accommodate claim, plaintiff must show that (1) she is a qualified individual with a disability; (2) defendant was aware of her disability; and (3) defendant failed to reasonably accommodate that disability. Ekstrand v. School District of Somerset, 583 F.3d 972, 975 (7th Cir. 2009).

In its motion for summary judgment, defendant challenges only plaintiff's ability to establish that she was a qualified individual with a disability. In particular, defendant contends that plaintiff cannot show that she was able to perform the essential functions of the store manager job, either with or without reasonable accommodation. Defendant contends that the permanent shoulder restrictions imposed by plaintiff's doctor in December 2015 rendered her incapable of performing many of the physical functions required of defendant's store managers.

### A. Essential Functions of Store Manager Position

Defendant argues that the "essential functions" of the store manager position include the following, as set forth in the written job description:

Constantly: Stand, Walk, Reach Outward, Handling/Fingering.

Frequently: Reach Above Shoulders, Squat or Kneel, Lift/Carry up to 40 lbs., Push/Pull up to 40 lbs.

Occasionally: Sit, Climb, Crawl, Lift/Carry 41 to 100 lbs. with assistance.

Dkt. #19-1. Defendants contend that store managers must be able to meet these physical requirements because they are responsible for tasks such as unloading freight, transporting

merchandise to the sales floor and arranging displays. In response, plaintiff argues that the actual essential functions of the store manager position include only minimal physical activities. In addition, plaintiff argues that when physical activities are required, store managers can delegate them to someone else.

"To determine whether a job function is essential, we look to the employer's judgment, written job descriptions, the amount of time spent on the function, and the experience of those who previously or currently hold the position." Majors, 714 F.3d at 533–34 (quoting Rooney v. Koch Air, LLC, 410 F.3d 376, 382 (7th Cir. 2005)). Also relevant are "the consequences for not requiring the individual to perform the duty." Stern v. St. Anthony's Health Center, 788 F.3d 276, 285 (7th Cir. 2015) (quoting Gratzl v. Office of the Chief Judges of the 12th, 18th, 19th, & 22nd Judicial Circuits, 601 F.3d 674, 679 (7th Cir. 2010)). Although "the employer's judgment is an important factor, . . . it is not controlling. . . .[W]e also look to evidence of the employer's actual practices in the workplace." Id.

In this instance, the written job description and the experience of other sales managers support defendant's argument that the essential functions of store manager include extensive physical activities that plaintiff could not perform herself while abiding by her permanent restrictions. As set forth in the written job description, all of defendant's store managers throughout the country are expected to constantly reach outward and handle merchandise, frequently reach above their shoulders and lift, carry, push or pull up to 40 pounds. Reed Lien, the current store manager, confirmed that the written job description is accurate. He

testified that both he and the two store managers who worked at the Menomonie store before plaintiff's arrival performed these essential physical functions when they unloaded freight, brought merchandise to the sales floor, arranged displays, retrieved merchandise for customers and carried merchandise to customer vehicles.

Another factor for determining whether a job duty is essential is "the consequences of not requiring the incumbent to perform the function." 29 C.F.R. § 1630.2(n)(3). Defendant has submitted evidence that it must staff its stores efficiently to control labor costs and respond quickly and efficiently to customer needs. Customer service is better if management is able to perform the physical tasks included in the job description in addition to managing and directing staff and daily store operations. If management cannot perform physical functions on a regular basis, defendant must incur higher costs by adding staff hours to maintain a high level of customer service. In this instance, defendant added sales associate hours to the Menomonie store while plaintiff was subject to temporary restrictions. However, because of the tight labor market for the Menomonie store, it was difficult for defendant to find people to staff allotted hours. If defendant cannot find employees able to work extra hours, customer service can suffer. Customers may have to wait for an available associate to obtain merchandise displayed at a high level in the store or to carry heavy items to their cars, such as a kayak, canoe or workout equipment. Merchandise may be unloaded, restocked and moved around at a slower rate.

Plaintiff asserts several arguments about why physical tasks exceeding her limitations are not essential functions of the store manager position. First, because defendant

designated the store manager position as "exempt" from the overtime provisions of the Fair Labor Standards Act, the position cannot have extensive physical labor as an essential function of the position. Labor regulations state that exempt employees are those "[w]hose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers." 29 C.F.R. § 541.200(a)(1)(2). However, this is not an FLSA case, and plaintiff cites no legal authority suggesting that an exempt classification under the FLSA is relevant to the "essential function" analysis in an ADA case. Plaintiff also cites no authority suggesting that manual labor cannot be an "essential function" of a management position.

Plaintiff's next argument is that in her own experience as store manager, she was not required to constantly reach out with both arms, constantly engage in repetitive grasping or torqueing with her wrists and hands, frequently reach above her head or frequently lift, carry, push or pull up to 40 pounds. She also argues that when such physical tasks were required, she could delegate them to other employees. However, plaintiff's argument is based solely on her personal experience on the job, which she often performed with temporary accommodations for her shoulder and arm restrictions. From the time she became a store manager, she was often under left shoulder or right shoulder restrictions, or off work on leaves of absence for lengthy periods of time. Her experience under these restrictions is not representative of defendant's general expectations for store managers.

In addition, the fact that plaintiff could delegate physical tasks such as unloading freight and retrieving merchandise to other employees does not render the tasks non-essential

to the store manager position. <u>Jones v. Walgreen Co.</u>, 679 F.3d 9, 17 (1st Cir. 2012) ("The fact that certain tasks associated with a particular position can be either reduced, reassigned, or reallocated to a subordinate does not, by itself, render them non-essential to the position they were associated to in the first place."). Similarly, the fact that defendant permitted plaintiff to rely heavily on her assistant manager and sales associates while she was operating under temporary restrictions, does not, by itself, show that the physical tasks identified in the store manager description were non-essential. <u>Id.</u> ("'An employer does not concede that a job function is 'non-essential' simply by voluntarily assuming the limited burden associated with a temporary accommodation.'") (citation omitted). Plaintiff concedes that her personal opinion about which tasks were essential contradicts defendant's expectations and the experiences of managers at other stores operated by defendant. Plt.'s Resp. to DPFOF ¶ 40. I conclude that her opinions are not sufficient to raise a genuine dispute of material fact about the essential functions of the store manager position.

B. <u>Plaintiff's Ability to Perform the Essential Functions of the Store Manager Position</u>

The next question is whether plaintiff was capable of performing the essential functions of the store manager position with or without reasonable accommodation. Plaintiff bears the burden of establishing that she could perform the essential functions of the position with or without reasonable accommodation. <u>Majors</u>, 714 F.3d at 534 (citing <u>Gratzl</u>, 601 F.3d at 680).

Defendant argues that plaintiff's permanent restrictions left her unable to perform

some essential functions of the store manager position. Defendant argues that plaintiff could not "constantly" reach outward, handle or finger with a permanent restriction of "no repetitive grasping or wrist motion with outstretched arm" and "no torqueing with hand and wrist." Defendant also argues that plaintiff could not "frequently" lift, carry, push or pull up to 40 pounds with a permanent limitation of lifting two pounds overhead with her right arm. Plaintiff also could not "frequently" reach above her shoulders, as she was permanently restricted to "rare" reaching above her shoulders, which meant one to five percent of the time.

The evidence supports defendant's argument. Even before plaintiff was subject to permanent restrictions, she had difficulty performing some of her tasks, including opening metal entry doors, carrying the cash registers, pushing four-way clothing racks, removing plastic from clothes, removing stuffing from shoes, removing shoe boxes from high shelves and repetitive movements. After she returned to work in September 2015, she could not lift one pound overhead in physical therapy, had difficulty washing her hair, sweeping, carrying a bag, pouring coffee and lifting a gallon of milk. Other employees and her district manager saw that she was in pain while attempting to perform physical tasks at work.

For her part, plaintiff does not argue that her permanent restrictions did not prevent her from performing the physical requirements listed in the written description without an accommodation. Instead, she argues that she was able to perform the duties of store manager effectively despite her restrictions, as shown by her positive performance reviews and lack of complaints by her subordinates, because she was able to use ladders, hooks and

dollies and could delegate physical tasks to other employees. She also argues that the medical opinions provided by her expert, Dr. Hebl, and the expert hired by defendant in conjunction with her workers' compensation claim support her claim that she could perform the essential functions of her job.

Plaintiff's arguments are not persuasive. Plaintiff cites no legal authority supporting her argument that her workers' compensation claim has any relevance to her ADA claim. The claims involve different legal standards and different decision-makers. In addition, the medical examination she had for her workers' compensation claim took place before plaintiff's doctor assigned permanent restrictions. Stern v. St. Anthony's Health Ctr., 788 F.3d 276, 288 (7th Cir. 2015) ("The relevant inquiry is whether Dr. Stern could perform the essential functions of his job at the time he was fired.") As for Dr. Hebl, his opinion that plaintiff could perform the essential functions of her position is based in part on plaintiff's description of the essential functions and her own experience. As discussed above, plaintiff's experience while subject to accommodations for her temporary shoulder restrictions is not representative of defendant's actual expectations for store managers. Accordingly, neither the workers' compensation examination or Hebl's opinion creates an issue of fact as to whether plaintiff was able to perform her job with or without accommodation.

Finally, plaintiff's suggestion that she could perform the essential functions of her position by either delegating physical tasks to other employees or using tools to perform them herself is not persuasive. "To have another employee perform a position's essential function, and to a certain extent perform the job for the employee, is not a reasonable

accommodation." <u>Major</u>, 714 F.3d at 534. <u>See also id.</u> (employee with lifting restriction was not qualified for position that involved "intermittent movement of heavy objects," and having another employee do lifting was not reasonable accommodation); <u>E.E.O.C. v. AutoZone, Inc.</u>, 809 F.3d 916, 922–23 (7th Cir. 2016) (accommodation request that would require someone else to do lifting for plaintiff was not reasonable because it would be "essentially delegating the [plaintiff's] position to another employee"); <u>Gratzl</u>, 601 F.3d at 681 (requiring other employees to perform plaintiff's essential functions is not reasonable accommodation and is not required by ADA); <u>James v. Hyatt Regency Chicago</u>, 707 F.3d 775, 778, 783 (7th Cir. 2013) (finding it was not reasonable accommodation for banquet steward at hotel with lifting restriction to delegate to another employee the tasks of lifting objects involved with maintaining banquet hall and transporting food and equipment); <u>Peters v. City of Mauston</u>, 311 F.3d 835, 840, 845 (7th Cir. 2002) (affirming summary judgment against equipment operator who suffered shoulder injury and was no longer able to lift or carry anything over fifty pounds, and concluding that permitting another employee to help him with lifting requirements was not reasonable accommodation); <u>Cochrum v. Old Ben Coal Co.</u>, 102 F.3d 908, 912 (7th Cir. 1996) (employee's suggested accommodation of hiring helper to perform overhead work required by position was not reasonable accommodation).

For a significant period of time, defendant accommodated plaintiff's temporary restrictions and permitted her to rely heavily on other employees or avoid physical tasks. However, defendant did so because it thought that the restrictions were temporary.

Defendant was not required to require other employees to perform plaintiff's essential functions on a permanent basis. Additionally, plaintiff's argument that she use ladders and other tools to successfully perform physical tasks such as reaching high shelves or unloading freight is not supported by the evidence. Instead, the evidence shows that by plaintiff's own estimation, she rarely performed physical tasks such as unloading freight or retrieving items from high shelves, and struggled even when using tools such as ladders or telescoping hooks. Thus, although plaintiff's performance as store manager might have met defendant's expectations of her abilities while she was temporarily restricted, defendant concluded reasonably that after plaintiff's restrictions became permanent, she could no longer effectively perform the broad range of tasks expected of a store manager. Therefore, I conclude that no reasonable jury could find that plaintiff could effectively perform the essential functions of the store manager position.

C. <u>Defendant's Alleged Failure to Engage in an "Interactive Process"</u>

As part of her failure to accommodate claim, plaintiff also contends that defendant violated the ADA by failing to engage her in interactive discussions regarding possible accommodations. In particular, plaintiff contends that defendant should not have terminated her employment without first discussing potential accommodations with plaintiff or plaintiff's doctor.

This argument is not persuasive. The interactive process between the employer and the employee is meant "to determine the appropriate accommodation for a qualified

individual with a disability." <u>Jackson v. City of Chicago</u>, 414 F.3d 806, 813 (7th Cir. 2005) (citing 29 C.F.R. § 1630.2(o)(3)). In its termination letter to plaintiff, defendant invited plaintiff to submit any additional information she thought defendant should consider. She chose not to do so. Even now, plaintiff has not identified any potential accommodation that she thinks would have allowed her to perform the essential functions of her job. Instead, she argues only that the store manager position does not require extensive physical labor and that even if it did, she can delegate those tasks to others. These arguments fail for the reasons discussed above. The accommodation that plaintiff seeks—that other people perform essential functions of the job she wants—is not reasonable, as a matter of law. Because plaintiff has failed to show that she could perform the essential functions of the position with a reasonable accommodation, whether defendant engaged in the interactive process is immaterial. <u>Majors</u>, 714 F.3d at 534–35 ("This record wouldn't allow a finding that Ms. Majors was a qualified individual, so whether the discussion between GE and Ms. Majors was sufficiently interactive is immaterial.").

Because plaintiff has failed to point to evidence that could support a finding that she was a qualified individual who could perform the essential functions of the store manager position, she cannot succeed on her disparate treatment or failure to accommodate claim. Therefore, defendant is entitled to summary judgment.

ORDER

IT IS ORDERED that defendant Dunham's Athleisure Corporation's motion for

summary judgment, dkt. #16, is GRANTED. The clerk of court is directed to enter

judgment for defendant and close this case.

Entered this 4th day of September, 2019.

BY THE COURT:

/s/

_____
BARBARA B. CRABB
District Judge